NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-310

ADOPTION OF GAEL.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After the mother stipulated to her current and future unfitness to parent her child, a Juvenile Court judge found that the placement plan put forward by the child for adoption by his foster parents would serve his best interests.[2]  The mother appeals, arguing that the judge abused her discretion by not approving the competing placement plan put forward by the mother and the Department of Children and Families (department) for adoption by the child's maternal great-aunt and great-uncle

---

[1] A pseudonym.

[2] The mother stipulated to her unfitness on October 5, 2022. At that time the judge issued orders finding the mother and the unknown or unnamed father unfit and terminating their parental rights.  Entry of the termination decree as to the mother was deferred pending a best interests hearing on the competing placement plans.  See Adoption of Douglas, 473 Mass. 1024, 1026 (2016).  The father did not appear at or participate in either proceeding and is not a party to this appeal.

(together, maternal relatives).[3]  The mother further argues that the judge erred by issuing a preliminary injunction barring the department from increasing visitation between the child and the maternal relatives.  We affirm.

Background.  The child was born substance exposed in July 2020.  The mother was twelve years old at the time.  After a report under G. L. c. 119, § 51A, was filed alleging neglect of the mother by her mother (grandmother), a department social worker interviewed the grandmother, who was "dismissive" of the reporter's concerns that the mother became pregnant at such a young age.  The grandmother stated that the mother had a mature body, that the situation was not unusual in the Dominican Republic, and that the mother was in love with the putative father.  The grandmother also admitted that she allowed the mother to continue to sleep over at the putative father's home after she became pregnant because "at that point, the damage was done."

In August 2020 the mother and the child were placed together with the foster parents.  Although the mother and the foster parents had a good relationship, the foster parents decided in the spring of 2022 that they could not continue as a placement for the mother because they discovered drugs in her

_____

[3] The department has appeared as an appellee on appeal.

room and because of other concerning behavior.  The mother was then reunified with the grandmother in June 2022.  The child remained in the foster home.

In July 2022, after the department's goal for the child was changed to permanency through adoption, the case was referred to Bridges Homeward, a child welfare agency, for adoption planning and case management services.  On August 8, 2022, the department sent letters to ten relatives who were identified as potential placements.  On August 29, 2022, the maternal relatives came forward to express interest in adopting the child.  This was the first contact they had with the department regarding the child.

The maternal relatives submitted an adoption application and were approved as an adoptive resource.  The foster parents were also approved as an adoptive resource.  Following a clinical review team meeting, the department, in conjunction with Bridges Homeward, identified the maternal relatives as the permanent resource for the child.  Although the department determined that the foster parents had "strong connections and attachments with [the child]" and that the child was doing well in their home, it proposed the maternal relatives as the permanent placement because of the "[t]he importance of children having the opportunity to grow up within their families of origin."  The child opposed the department's plan and proposed

3

adoption by the foster parents, citing the detrimental impact of disrupting his placement.

The best interests hearing began on May 10, 2023, was continued on June 30, and was again continued on August 10, 2023. Meanwhile, on May 26, 2023, the child filed an abuse of discretion motion claiming that the department had acted against his best interests by deciding to expand his visitation with the maternal relatives from weekly one-hour supervised visits to weekly three-hour unsupervised visits. On June 2, 2023, the child moved to enjoin the department from implementing the new visitation schedule. On June 15, 2023, the judge allowed both motions and issued an injunction requiring the department to maintain the child's current visitation schedule with the maternal relatives until the judge had "heard all of the available evidence and decided which plan is in the child's best interests."[4]

In October 2023 the department's counsel withdrew from the case, and a successor counsel entered her appearance. The change in representation resulted in an extended delay of the best interests hearing, causing the judge to declare a mistrial

_____

[4] The mother sought interlocutory review of the judge's order by filing a petition under G. L. c. 231, § 118, first par., with a single justice of this court. The single justice denied the petition on the ground that the mother had failed to demonstrate a clear error of law or abuse of discretion.

4

in February 2024. The hearing then began again in July 2024 and continued for eleven nonconsecutive days, concluding on October 4, 2024. Multiple witnesses testified, including the child's expert, Dr. Dante Spetter, who was qualified as an expert in parent-child attachment and child development. At the conclusion of the hearing, the judge found that adoption by the foster parents would serve the child's best interests. The judge issued her written findings of fact and conclusions of law on December 19, 2024, and ordered that the termination decree as to the mother be entered nunc pro tunc to October 5, 2022.

Additional facts are reserved for later discussion.

Discussion. 1. Choice of placement plan. Determining which placement plan will serve the best interests of a child "is a question that presents the trial judge 'with a classic example of a discretionary decision'" to which we afford "substantial deference." Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999), quoting Adoption of a Minor (No. 2), 367 Mass. 684, 688 (1975). "Particularly where, as here, close scrutiny of lay and expert witnesses was central to the judge's decision, our task is not to decide whether we, presented with the same facts, would have made the same decision, but to determine whether the trial judge abused [her] discretion or committed a clear error

5

of law." Adoption of Hugo, supra. An abuse of discretion occurs only if "the judge made a clear error of judgment in weighing the factors relevant to the decision, . . . such that the decision falls outside the range of reasonable alternatives" (quotation omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

Here, the judge was faced with the immensely difficult choice between two potential adoptive families who had each been approved to adopt the child after a home study. In deciding that adoption by the foster parents would serve the child's best interests, the judge considered multiple factors, "including the child's attachment, culture, communication with caretakers, ability for self-care versus care by others, and each placement's ability to nurture and support the child's individualized needs." The judge then made extensive factual findings, which, in large and relevant part, the mother does not challenge as clearly erroneous.[5]

---

[5] Although the mother identifies a few minor errors in the findings, those errors are harmless as they were "not central to the ultimate conclusion of [best interests]." Care & Protection of Olga, 57 Mass. App. Ct. 821, 825 (2003). The remainder of the mother's factual challenges "amount to no more than dissatisfaction with the judge's weighing of the evidence and [her] credibility determinations." Adoption of Quentin, 424 Mass. 882, 886 n.3 (1997).

6

With respect to the foster parents, the judge found that the child had lived with them since he was five days old, was securely attached to them, and referred to them as "Daddy" and "Mommy."  The child also has a close relationship with his two foster sisters; they view him as their brother, and he views them as his sisters.  The child has some developmental delays and, because of his exposure to cocaine in utero, is at increased risk of having academic and behavioral difficulties as he gets older.  Since the child was put in the foster parents' care, they had made "every effort" to meet his unique needs. The foster parents are committed and well equipped to address developmental challenges as they may arise in the future, as evidenced by their extensive work with foster children and the foster mother's degree and experience as a special education paraprofessional.

In addition, the judge found that the foster parents had "made genuine attempts to connect [the child] to his Dominican culture."  Those efforts included buying Spanish-language books to read to the child, attending Spanish story time at the local library, putting Spanish-language programs on the television for him, exposing him to Dominican food, and making plans to enroll

7

him in a bilingual school program.[6]  The judge credited the foster mother's testimony that she is open to continued suggestions about how to keep the child connected to his culture and open to maintaining contact between the child and the mother,[7] as well as other maternal relatives, including the grandmother.

In comparison, the judge found that the maternal relatives were "not attuned to or aware of [the child's] individual needs" and that the great-aunt's motive for adopting him was loyalty to her sister (the grandmother).  The judge observed that the maternal relatives made no efforts to get to know the child for the first two years of his life while he was in foster care. During those two years, the maternal relatives did not contact the department to be considered as a resource or foster placement and did not request visits with either the child or the mother.[8]  The maternal relatives did not begin visiting the

---

[6] Both the foster mother and the foster father testified that they do not speak Spanish.

[7] The judge ordered that the child and the mother have four in-person visits per year and encouraged the foster parents to provide additional access "through video calls or other technological means" if they determined it to be in the child's best interests.

[8] We acknowledge that the first two years of the child's life were during the COVID-19 pandemic and that the great-aunt testified that she was preoccupied during that period helping her son through a divorce.

child until April 2023.  Although they arrived on time for the visits and the department noted no protective concerns, the judge credited Dr. Spetter's testimony that the child did not exhibit any attachment to the maternal relatives and that the great-aunt was not attuned to the child during the visits.[9]  The great-aunt did not follow the child when he was playing and sometimes would not answer at all when he spoke to her.  After about twenty to forty minutes, the child would become tired and upset and try to disengage.  While the child was affectionate toward the great-uncle, he did not exhibit attachment to him.  Dr. Spetter observed very limited verbal communication between the maternal relatives and the child.

The judge further credited Dr. Spetter's testimony that the child would experience a disrupted attachment if he were removed from the foster parents and placed with the maternal relatives, increasing his risk of experiencing future challenges such as mood and anxiety disorders; that the child would require a minimum of three to five months to transition between placements and would benefit from psychotherapy to help him adjust; and that limited communication between the maternal relatives and the child could create stress for him.  As the judge found,

_____

[9] Dr. Spetter observed three visits in June 2023, February 2024, and April 2024.  The great-uncle was not present for the June 2023 visit.

9

however, the great-aunt could not articulate at trial how she would work to bridge the communication difficulties between herself and the child, testifying that she had no concerns about not being able to communicate with him.[10]  Nor could the great-aunt articulate how she would assist the child with transitioning from the only home he had known for four years.[11] The judge also noted that the great-uncle did not testify or appear at trial.[12]

Based on these findings, which are unchallenged on appeal, the judge was within her discretion to conclude that adoption by the foster parents would serve the child's best interests. Undoubtedly, as the judge recognized, "[a] biological and/or a cultural match between child and caretaker is a desirable aim." Adoption of Irene, 54 Mass. App. Ct. 613, 622-623 (2002). "[B]ut it is a single factor among many," id., and here, the judge concluded that other factors supported placement with the foster parents.  The judge credited Dr. Spetter's testimony that

_____

[10] The child has been exposed to some Spanish words and phrases but communicates in English.  The maternal relatives speak minimal English.

[11] The great-aunt testified that "we decided to move forward with the adoption process because we are [the child's] family. [The child] has us, we're his blood. . . .  We're claiming our own blood, our own family, because that child is not alone.  His mother is there, we're here as his family . . . ."

[12] Both foster parents testified at trial.

10

a secure attachment is crucial for a child's emotional health and development and that "attachment comes first [and] identity comes later."  The judge noted that neither the department nor the mother presented expert evidence supporting their view that being raised in a Dominican family would be more essential to the child's well-being than maintaining his secure attachment.

The judge did not, however, treat "avoiding the trauma of separation" as the determinative factor or rely too heavily on the bond between the child and the foster family, as the mother argues.  See Adoption of Hugo, 428 Mass. at 230 (no presumption in favor of adoption by foster family exists based solely on evidence of bonding).  Underpinning the judge's decision were her findings that the maternal relatives were indifferent toward the child as an individual, as evidenced by their lack of efforts to get to know him or present themselves as a resource to the department for two years; that the great-aunt was not motivated to learn about his needs; and that the great-aunt lacked insight into the challenges he would face if he were transitioned into her home.  The judge also discredited the great-aunt's testimony that she would not allow the mother or the grandmother to be alone, unsupervised, with the child.  Instead, the judge found that the great-aunt would allow them unfettered access to the child, which would not be in his best

11

interests.[13]  We defer to the judge's credibility determination,
see Adoption of Frederick, 405 Mass. 1, 10 (1989), which is
additionally supported by the great-aunt's testimony that she
would have no concerns for the child's safety if he were cared
for alone by the mother or the grandmother.  See Adoption of
Jacob, 99 Mass. App. Ct. 258, 272-273 (2021) (judge did not
abuse discretion in finding that placement with grandparents
would not advance child's best interests where "judge reached
the well-founded conclusion that the grandparents were
'enmeshed' with the father, and that their inability to place
boundaries on the father would be harmful to [the child]");
Adoption of Zak, 87 Mass. App. Ct. 540, 545 (2015) (judge did
not abuse discretion in "denying placement to the maternal
great-aunt despite her familial and cultural connections to the
children," given her "passivity" about domestic violence between
children's parents).

---

[13] The mother argues that the judge erred by finding the
mother and the grandmother to be "demonstrably unfit parents."
We are unpersuaded.  As mentioned, the mother stipulated to her
unfitness.  With regard to the grandmother, while it is true
that she was not adjudicated to be unfit, it is plain in context
that the judge was addressing whether the grandmother could be
an appropriate caregiver for the child were he placed in the
maternal relatives' home.  The judge's subsidiary findings
regarding the grandmother's care of the mother support her
conclusion that the grandmother had serious shortcomings as a
caregiver, which the great-aunt failed to recognize.

As this case illustrates, when determining the best interests of a child, it is not possible "to make decisions with precision, and . . . 'much must be left to the trial judge's experience and judgment.'" Adoption of Hugo, 428 Mass. at 225, quoting Adoption of a Minor (No. 2), 367 Mass. at 688. Here, the judge could reasonably have found it "more likely that [the child] will receive the home support, stability, and reinforcement of efforts to address his developmental needs so critical to his future development" in his current placement with the foster parents. Adoption of Hugo, supra at 229. "As the trier of fact, [the judge] was in the best position to evaluate all the evidence, contradictory at times." Id. Because the judge's decision was not outside the range of reasonable alternatives, we discern no abuse of discretion. See L.L., 470 Mass. at 185 n.27.

2. Preliminary injunction. As mentioned, the judge enjoined the department from expanding the maternal relatives' visits with the child from weekly one-hour supervised visits to weekly three-hour unsupervised visits. The mother argues that this was error because the judge did not have the authority to order the department to carry out its custodial powers in a specific way. Alternatively, the mother argues that the judge

13

did not correctly apply the legal standard for issuing a preliminary injunction.

We need not address these arguments on the merits, nor need we address the child's claims of mootness and waiver, because the mother has failed to demonstrate material prejudice. Even accepting the mother's assertion that the injunction "directly led to the lack of attachment with the" maternal relatives, the lack of an attachment was one of many factors that the judge relied on in deciding the child's best interests, as discussed above. Thus, we conclude that the mother has failed to show that any error "injuriously affected" her "substantial rights." Adoption of Seth, 29 Mass. App. Ct. 343, 353 (1990), quoting G. L. c. 231, §§ 119, 132.

Decree affirmed.

By the Court (Blake, C.J., Shin & Wood, JJ.[14]),

Clerk

Entered: June 30, 2026.

---

[14] The panelists are listed in order of seniority.